587 S.E.2d 822 (2003)
263 Ga. App. 325
In the Interest of D.D.B., a child.
No. A03A1441.
Court of Appeals of Georgia.
September 23, 2003.
William H. Newton III, for Appellant.
*823 Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Holly A. Bradfield, for appellee.
ANDREWS, Presiding Judge.
The mother of D.D.B., a minor child, appeals from the order of the Juvenile Court of Floyd County terminating her parental rights. After reviewing the record on appeal, we conclude that the juvenile court's order was supported by clear and convincing evidence and affirm.
D.D.B. was born in August 2001. Shortly thereafter, the Floyd County Department of Family and Children Services (the Department) asked for and received immediate custody of the child. On September 12, 2001, the Department filed a petition with the juvenile court alleging that D.D.B. was deprived. After a hearing in which the mother was present, the juvenile court made findings of fact, including that the mother had syphilis while she was pregnant, but refused treatment, and that the mother had recently been hospitalized for the treatment of her mental illness, a bipolar disorder for which she did not consistently take her medication. The juvenile court found D.D.B. to be deprived.
On March 14, 2002, the Department filed a petition to terminate the parental rights of D.D.B.'s mother and his putative father. The matter came before the juvenile court on February 14, 2003. Julia Terrell, D.D.B.'s case manager, testified that the mother had completed a great deal of the goals of her case plan for reunification with D.D.B., but not all of them. Terrell described the mother's behavior during their meetings. During their first visit, when D.D.B. was three weeks old, the mother brought a can of Coke for the child because she believed he would be tired of drinking breast milk. When D.D.B. was eight months old, the mother brought him a bag of food consisting of noodles, chocolate bars, and cheese crackers. On several occasions, the mother told Terrell that D.D.B. must be teething because the mother's own teeth hurt. Terrell also recounted that she and the mother took the same path every week for a year to the visitation room to see D.D.B., which consisted of walking down one hallway and making one turn to get to the room, but that every week the mother would need to be directed on how to leave the building. Terrell testified that her main concern was the consistency of the mother's mental health. The mother's case plan for reunification required that she maintain her mental health, but Terrell considered her compliance to be only sporadic.
B.J.B., the mother's seventeen-year-old daughter, testified that she had been removed from the mother's custody and had been with foster parents for eight years. B.J.B. had contact with her mother, and described her mother as having good days or bad days, depending on whether she had taken her medication. On bad days, the mother would be aggressive and blame B.J.B. for things she did not do.
The State supplemented the record with the deposition of Dr. Richard Hark. Hark, a licensed psychologist, evaluated the mother in October 1998 and December 2001. In Hark's opinion, the mother was a paranoid schizophrenic whose condition was sometimes compensated by medicine but became "full-blown" when she did not take her prescribed medication. He described the mother as having illogical and tangential thoughts, aggressive outbursts, hallucinations and delusions, as well as manic tendencies. In Hark's opinion, the mother's condition could be partially compensated by medication, but it would be reasonable to conclude, in view of her history, that she would not consistently take her medication in the future. Hark also testified that the mother's condition "would make it impossible for her to be a reliable, dependable parent because her judgment is so impaired, her thinking is so illogical that she wouldn't make good decisions about a child."
The Department introduced the deposition of Tracey Ball into evidence. Ball was a technician with Highland Rivers Behavioral Health Services (HRBHS). The mother participated in HRBHS's peer support program for individuals with "schizophrenic, schizo-effective, [and] bipolar" disorders. The mother had, according to Ball, a schizo-effective *824 or bipolar disorder which caused her at times to become manic, which would interfere with her ability to care for a child. Ball also deposed that when the mother was pregnant with D.D.B. that she stopped taking her medication and was hospitalized. The mother had been hospitalized four times in the previous nine years in connection with her mental disorder. Ball believed that the mother was in "a little bit of a denial" about her condition, causing her to fail to consistently seek treatment or take her prescribed medication.
1. In order to terminate parental rights, a juvenile court must determine (1) that there is present clear and convincing evidence of parental misconduct or inability; and (2) that termination of parental rights is in the best interest of the child, considering the physical, mental, emotional, and moral condition and needs of the child. OCGA § 15-11-94(a).
A determination of parental misconduct or inability requires findings that (1) the child is deprived; (2) the deprivation is caused by lack of proper parental care or control; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation will likely cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94(b)(4)(A). Among the factors relevant to determining whether the child is without proper parental care and control is a medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child. OCGA § 15-11-94(b)(4)(B)(i). On appeal, we determine whether, viewing the evidence in the light most favorable to the juvenile court's decision, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. In the Interest of C.J. V., 236 Ga.App. 770, 771, 513 S.E.2d 513 (1999).
(a) The mother never appealed the deprivation order filed November 9, 2001. Thus, she cannot challenge the finding that D.D.B. was deprived. See In the Interest of D. B., 257 Ga.App. 497(1), 572 S.E.2d 9 (2002).
(b) Clear and convincing evidence showed the mother suffered from a serious medical condition making her unfit to parent. See OCGA § 15-11-94(b)(4)(B)(i). Accordingly, the juvenile court was entitled to conclude that D.D.B.'s deprivation was caused by lack of proper parental care or control. See In the Interest of M. L., 259 Ga.App. 534, 536(1)(b), 578 S.E.2d 190 (2003) (mother had mental health deficiencies that rendered her incapable of providing adequately for her children).
(c) We also find that clear and convincing evidence supports the juvenile court's findings that the cause of the deprivation is likely to continue and is likely to cause serious harm to D.D.B. The court was permitted to consider the mother's past conduct, especially her unwillingness to consistently treat her mental condition, in determining that the deprivation would likely continue. In the Interest of D.S., 247 Ga.App. 569, 573, 545 S.E.2d 1 (2001). The mother argues that there is insufficient evidence to demonstrate that D.D.B. had suffered or was likely to suffer from a continuing relationship with his mother or from remaining in foster care. See, e.g., In the Interest of K. J., 226 Ga.App. 303, 308, 486 S.E.2d 899 (1997) (no testimony showing the child was likely to suffer harm if parental relationship not terminated). But given the serious nature of the mother's mental illness, as well as the testimony of the mother's daughter, who had been exposed to the mother's irrational behavior, the juvenile court was authorized to conclude that the continuing contact with the mother was likely to cause serious harm to the child.
2. Finally, the juvenile court was authorized to conclude that the termination of the mother's parental rights was in D.D.B.'s best interest. In making this determination, the court could consider the same factors that supported its finding of parental inability. In the Interest of M. V., 253 Ga. App. 669, 672, 560 S.E.2d 125 (2002). Furthermore, "[i]n determining that [termination of] the mother's parental rights would serve the best interest[ ] of the [child], the court properly concerned itself with the need for *825 stability in [his life]." In the Interest of R. N., 224 Ga.App. 202, 205(2), 480 S.E.2d 243 (1997). The trial court found, as supported by the evidence, that D.D.B. had been in the same home from birth and that the "home... desires to adopt." Based on the evidence discussed above, any rational trier of fact could have concluded that termination of parental rights was in the best interest of the child.
Judgment affirmed.
BARNES and ADAMS, JJ., concur.